Good morning, Your Honor. May it please the Court. Dana Berkowitz for Plaintiff's Appellants. Defendants in this case are fiduciaries of a $6 billion participant-directed retirement plan. They did nothing when a $500 million investment option concentrated over 30% of its assets in one stock. Plaintiffs here have plausibly alleged that prudent fiduciaries in defendant's shoes would have noticed that development and taken some action to protect participants. In fact, defendants' inaction here was a shocking departure from the norm. In holding otherwise, the District Court misconstrued plaintiff's allegations and resolved questions of fact at the pleading stage. This Court should reverse. What facts did you allege that would plausibly give rise to an inference of breach of the duty? When I read the complaints, both original and amended, the only real fact I find is that the fund went down in value. What other fact did you allege? Your Honor, we've alleged facts that give rise to would have given a Okay, tell me what they are. Tell me what those facts are. to pay careful attention to the Sequoia Fund, certainly. This was a huge plan for unsophisticated investors. That's at the SAC paragraph 37. This was an outlier mutual fund. Unlike most mutual funds that have hundreds of investments, this had only a few. It was of a type that's extremely popular for retirement investment. Actively managed domestic equity funds comprise about 31% of retirement savings in this country. And, in fact, this was an extremely popular option among plan participants, attracting a half-billion dollar in allocations. So what do those facts suggest that the fiduciary breached its duty? They show that the fiduciaries here had reason to pay careful attention to the Sequoia Fund. But, in fact, they paid no attention. How do we know that? The way that we know that is that they did nothing. As the Sequoia Fund became 32% concentrated in one stock, this would have been obvious to a casual observer. Independent directors of the Sequoia Fund resigned in protest, making national news in October of 2015. Prudent fiduciaries under these circumstances would not sit on their hands. Here, they might have divested from the Sequoia Fund. They might have stopped new allocations to the Sequoia Fund. At a minimum, they would have warned participants of the risks associated with investing in the Sequoia Fund. As it was, participants could have thought that the Sequoia Fund was the kind of default option that they could expect from most domestic equity mutual funds. And, in fact, that that was how it was presented to participants in the SBDC. On that one, tell me what the evidence is about how it was presented. When I look at the plan documents, they say this fund's got some risk. We're going to try to invest in undervalued stocks, and that's a risky business, and this is a more risky fund than others. Where were the representations that the fund was safe and the things like that? Your Honor, the SPD directs participants to the Sequoia Fund Prospectus. It says, please take a look at that for more information. That Sequoia Fund Prospectus from 2015 was materially unchanged from the Sequoia Fund Prospectus in 2009. No, I'm asking a different question. You said this was represented to participants as a safe fund, if you will. I'm trying to find out where that representation is. So the Sequoia Fund was represented as moderately non-diversified, true, but it was told that it contained language to the effect of the plan will invest in undervalued securities that it believes have the potential for growth. It did invest in undervalued securities. They just didn't grow, I take it. It did. You know, over the course of this whole debate about how the fund was represented to participants, this is really a dispute of the facts. We've alleged that the Sequoia Fund, in fact, held itself out as a value fund. Well, I know you've alleged that, but the difficulty is you've also incorporated the plan documents into your complaint, if you will, and I don't see that anywhere. So are you alleging that they did it outside the plan documents in some way? Your Honor, the plan documents are ambiguous boilerplate. That's our point. They are. That's right. So they don't say what you said. Well, but they tell people who are interested in actual information about the plan to consult the prospectus. The prospectus lists eight risks associated with the Sequoia Fund. One of those is value investing risk. None of those risks is the risk that the Sequoia Fund— Let me stop you for a second because this is my difficulty. You probably have a wonderful suit against the Sequoia Fund. But my question is what did the plan represent to you? The plan just said take a look at the documents. So they didn't make an affirmative misrepresentation. Your argument is they should have paid more attention to this and known that the documents were wrong. Isn't that your argument? Your Honor, our point, I think, is twofold. The first is ERISA isn't a disclosure-based regime like the securities laws. So the plan fiduciaries can't just put out some boilerplate and say, hey, it's not affirmatively misleading. We're off the hook. They actually have to take a look at what's going on in the funds themselves. They are the gatekeepers. But your argument is that they neglected their duty to see what was going on. I understand that argument. I'm having a more difficult time with your argument that they somehow represented to your putative clients that this fund was better than it was. I can't find that anywhere. Your Honor, they're all part and parcel of the same duty of prudence claim. Oh, sure, they're all part and parcel of it. I'm looking for facts that support the misrepresentation side of your argument. It's facts alleged in either of your complaints or in the documents incorporated, and I can't find them. That's my problem. So the complaint alleges at paragraphs 58 to 63 the allegations that are contained in the Sequoia Funds Prospectus. Expert discovery will show that the Sequoia Funds Prospectus describes it as a value fund. And you don't have to believe me. If you go onto the Sequoia Funds website today, it says, and I quote, through multiple market cycles, portfolio managers, and generations of leadership, the firm has managed the fund with a long-term value-oriented approach. The district court simply discredited those allegations at the pleading stage. They're in the complaint at 58 to 63. But your allegation is really, I take it, that it's not that the Sequoia Fund made a misrepresentation in its prospectus because you're not suing them. Your argument is that the trustees should have discovered that in the exercise of due diligence. Isn't that your argument? Our argument is that the trustees should have discovered in the exercise of due diligence, which looking at the annual statement would have sufficed here, that the Sequoia Fund was 30 percent invested in one stock and that prudent fiduciaries would not have sat on their hands under those circumstances. They would have taken some action to protect participants. The fact that they did nothing is strong evidence both of the fact that they weren't paying any attention here and that that actually caused a loss to participants in this plan who had put their nest eggs in the Sequoia Fund under the misimpression that it was just like other domestic equity funds. That's our claim. I'd like to reserve the remainder of my time for rebuttal, if I may. Okay. Good morning, Your Honors, and may it please the Court. Plaintiffs claim that Disney acted imprudently with respect to the Sequoia Fund, which was just one of 26 options in the diverse Disney lineup, is wholly implausible. Disney acted imprudently, plaintiffs say, because after five years of enormously successful returns in the Sequoia Fund, Disney did nothing, they say, to address that excellent track record. According to plaintiffs, any prudent fiduciary would respond to that excellent track record, five years of 1,000 percent increases in the fund's returns, by either removing the fund at that point because it had become too risky, they say, or by telling participants that Sequoia was non-diversified and that it presented risks associated with a growth strategy. But ERISA does not require fiduciaries to time the market and to deny participants access to a successful fund before the performance of that fund turns south. What about the concentration theory, though? You do have an obligation to monitor, I think you assume, and from your brief, just to put one issue aside at the outset, you're not relying on the statute of limitations defense, right? That's correct. That's the court's side of what's decided. But you do have a duty under TIBLS to monitor. Absolutely. And 30 percent is pretty high concentration, so why doesn't that create at least a fact issue that allowing a fund to get to over 30 percent, you're violating your fiduciary duty to monitor? All right, so a couple of points. The question is whether the fact that it became concentrated because of performance, and I think that's a critical background fact that's made clear in Paragraph 69 of their complaint, that makes clear that what happened in the fund was an investment in Sequoia, was an investment in Valiant in 2010 when it was undervalued. And then it performed remarkably well, and Sequoia, therefore, performed remarkably well. And that's what drove the relative percentage up to 30 percent in 2015. Well, but the fact that it performed remarkably well doesn't obviate your duty to monitor, does it? Of course not. Bernie Madoff's funds performed remarkably well until they crashed. So the question is, are the facts alleged here, which is that you had a fund in which there was, as Judge Malloy said, a 30-something percent concentration in one stock. Whatever its performance, put that aside for a second. Are those facts enough to give rise to an inference that your clients didn't exercise their duty of monitoring? The answer is no, and I want to be very clear. What the plaintiffs say is not generally when a fund goes up to 30 percent, you have a duty to monitor it. That wouldn't tell you anything, that they weren't monitoring. What they say is we have an inference that they weren't monitoring because they didn't take particular actions. Right? That's what they say. Plaintiffs, the brief at page 29, paragraph 5 and 105 of their complaint, they say we can tell they weren't monitoring because any prudent fiduciary would have pulled the fund out or would have changed the warning and told plaintiffs that there was this growth strategy going on in the fund. And the problems with that are neither of those allegations support an inference that they weren't monitoring because, first of all, there's no basis for a duty to pull a successful fund out before it goes south because we know clearly from Dudenhofer and this court's own opinion in Kwan, anticipating Dudenhofer, that market, that fiduciaries don't have an obligation to be prescient and predict the failure of a fund before the decline in performance before that occurs. So the fact that the fiduciaries in September of 2015 kept a successfully performing fund, and with 30%, it had gone up to 30% because of the success, doesn't tell you that they weren't monitoring. The fact that they didn't pull it out doesn't tell you they weren't monitoring it. They just didn't pull out the successful fund at that point. See, and that's one of the difficulties with Dudenhofer in all of our cases. We talk about the duty to monitor, but of course we don't know whether you've been monitoring or not. Because we're looking at the complaint. You may not have monitored and you may have been lucky. You may have monitored and been unlucky. And so the question is, what's the quantum of facts that can give rise to a plausible inference of failure to monitor? So there certainly are facts. They're just not pleaded here. But let me give some examples. I think there's two categories of kinds of claims where you can plead and get to discovery on an inquiry into whether or not there's an actual breach of the duty to monitor. You can't just plead something and say there could have been a failure to monitor. That's just a mere possibility, right, under Twombly. We know that's not enough. Two categories, though. One is a case where you've got an actual demonstrable problem in the process. You've got a demonstrable conflict of interest. You know, you've got some sort of scandal. So it's the Disney mutual fund. And the Disney directors want that to do with them. There's allegations like that out there all the time. There's cases pending in this court where there's an alleged conflict. So that's one way to do it. That's not their story. So that's fine. The other one, though, and everybody agrees with this, too, is that you can allege red flags that are actual red flags, something that any prudent fiduciary would have responded to and dealt with, and in the absence of action does suggest, well, something must have happened there. So go back to Joe's question. Why doesn't that big concentration, why isn't that a red flag? Because the concentration itself isn't a problem in any sense. It's not a substantive problem. They tried a concentration theory. Their first complaint said that 30 percent violated the fund's own anti-concentration rule. They abandoned it, as we pointed out in a footnote in our brief, in their second complaint, because we showed it was just not true, that it wasn't a violation of the concentration policy, because the concentration policy says you can't make an initial investment, a purchase in stocks that goes up to more than 25 percent of an industry sector. It doesn't say, and the SEC has never said that it's a violation or any kind of substantive problem to purchase a stock. Remember when they purchased, Sequoia purchased Valiant? It was 8 percent of the holdings. No problems there. And then it did well. It just kept doing well, 1,000 percent increase over the next five years. That's what the concentration resulted from. The SEC doesn't say that's a problem. The IPS doesn't say it's a problem. Sequoia Fund's own government documents don't say a problem. It's perfectly fine to have a successful investment and no requirement under the securities laws or under ERISA for an ERISA fiduciary to say, you succeeded too much, now I'm required as a matter of law to pull this out of the lineup because somehow it could go south. That's what Dudenhofer says fiduciaries don't have a duty to do. Is there an allegation in this case, I didn't see it but I want to make sure I'm right, that the trustees, the fund, breached the duty by not pulling out soon enough when the fund started going down? That was certainly the first complaint. That's right. And I'm wondering, is that in the second complaint, do you think? It's not clear. They say it's not, but they do say in their brief at page 32, 33, 34, that the fund became too risky, quote, unquote, too risky. Of course, there was a point in time when somebody looking at this would say, oh, my God, there's a problem, it's going down. Well, it's going down, right. They're saying that the breach occurred in September before it went down. Before it went down, that's what I'm asking. That's what I'm asking. Is there an allegation that there was another breach after it started going down by not then pulling out? They certainly allege no facts that would support an inference that you have a duty to bail out at some point. Indeed, this is supposed to be a long-term investment, and courts after court have said you can ride out ebbs and flows in the stock performance. So their allegation is that they should have pulled out in September of 2015. As it was going, as it was reaching its peak. Yeah, when it was around its peak. No, I was just, I wasn't clear what that allegation was. And I want to be clear about this. They say it's too risky. Dudenhofer addressed that. At page 2464 of the Dudenhofer opinion, it describes the claim as the stock is overvalued and excessively risky. And then at 2471, of course, the court issues the basic holding of Dudenhofer, which is that an inverse of fiduciary is entitled to rely on the market prices accurately capturing the value of the stock, including its risk. Risk is priced into the value of the stock. I want to briefly, if I can, address the disclosure point, because I think, as Your Honor pulled out through questioning, that is another dimension of their claim. I don't think it's the only dimension of their claim, but it's an important one.  Look at the disclosure. And I think Judge Hurwitz got this right in the questions. It appears in the ER169. It was only a question. Questions are always right. The answers may be wrong. Absolutely. You're asking the right questions. And they are ER169. If you look at the disclosure, literally every section of the disclosure discloses the possibility of investment in a growth security that succeeds. Start with the first words. The first words are domestic equity, large blend. It's not described as a value fund. It's described as a large blend. As your colleague points out, it does use the words value fairly often. So would an ordinary investor or a reasonable investor look at this, think it was being represented as a value fund? I guess that's their position. What's wrong with that? Well, I think a number of things are wrong with it. First of all, if you look at the whole of the disclosure over and over again, it refers to the risks of growth stocks over and over again, a growth strategy. It's telling participants this fund encompasses the kind of risks you would experience in a fund that invests in growth securities. It's explicit. And, again, every relevant aspect of the disclosure includes that kind of disclosure. The second point, though, is there's nothing, as a matter of law, talismanic about saying value versus growth. These are not on-off switches if something is true or not true. It's not a value fund one day, and then because one of the investments performs and gets to 30 percent, it becomes a growth fund. You're not going to see that anywhere in the law. It doesn't, as a matter of law, become. Let me ask a factual question because we're not talking about what Sequoia said in its prospectus, et cetera. Was there any representation by the trustees, to use a short term, that this was a value fund or a growth fund or anything like that? Do they have a menu that says value funds, growth funds, et cetera? No, the menu is quite the contrary. The menu is between passive, active, and target date, and this was accurately characterized as among the seven active options, three of which were equity funds. Nothing is described as value, growth, separate like that. There are growth funds, funds that are described as growth funds. The disclosures in the growth fund descriptions are the same as the disclosures in the blend fund, which is a Sequoia fund. So nobody could read this and say this is both conclusively what anybody would only call a value fund and will never have the kind of risk presented in a growth fund, nor is there anything either in the SPD or the prospectus that says, if one of our value investments performs so well and we get to 25 percent, 30 percent concentration, we're going to sell it. All right, counsel, you've exceeded your time. Thank you. Thank you. Rebuttal. Your Honor, if you look at the Sequoia fund menu on page 139 of the ER, it shows the three domestic equity funds that the plan has chosen to offer. Two of them are labeled as growth funds, and the third is the Sequoia fund. Now, the plan here had a mandate to offer broadly diversified options within each investment class. So here, participants would reasonably have expected the Sequoia fund to be that alternative option, not a growth option. But if there was any confusion, the prospectus, again, which the SPD references, says the balance sheets and earnings history and prospects of each company are extensively studied to appraise fundamental value. That is a value fund disclosure. That's what the Sequoia fund is all about.  Well, what do you say to Mr. Hacker's argument that, I think he's saying, that this stock value went up 1,000 percent and everybody made lots of money. Is there at some point you should have said when it was 25 percent concentration and it had gone up 600 percent, now we have to pull it? Or is it when it gets to 28 percent concentration, now we have to pull it? When you make such a good investment that it becomes so concentrated, would you be in suing if they had gotten out too early? No, Your Honor. I think Tatum conclusively resolves for us the question of whether fiduciaries can be held liable for being too risk-averse. The answer is no. Fiduciaries can only be held liable if they are oblivious to risk, and that's what happened here. Judge Posner's well-reasoned opinion in the Armstrong case, I think, is instructive. There he says a trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent. That's exactly what happened here. No matter how it became that concentrated, it became so concentrated and increased the risk of loss to the plan and to its beneficiaries. So let's assume that I'm a prudent fiduciary and I'm monitoring this fund and it becomes this concentrated. What am I required to do? I think that's a fact question in most cases. Well, give me a fact. So the courts have identified any number of alternative or monitoring actions that prudent fiduciaries could take. They could consult outside investment advisers. They could consult outside counsel. That's the point, I guess. There's lots of things one could do. How can I infer from this record, which the sad task Dudenhofer puts on me, how can I infer from this record that they didn't do that? But you're basically saying there's no affirmative evidence that they did that, but that's not what your burden is. Your burden is to make it more plausible than not that they didn't. So how can I get there from this record? Your Honor, the Eighth Circuit in Braden has a helpful commentary on this, and it says that arrest of plaintiffs are rarely going to be in a position to provide direct evidence of wrongdoing. So what they've got to do is give facts that give rise to some reasonable inference that planned processes were flawed. If we haven't met that burden here by showing that fiduciaries did nothing when their own disclosures were gobbledygook and— Well, see, but that's my problem is you haven't shown that they've done nothing. What you've shown is that they didn't pull out of the fund or make an affirmative disclosure. For all we know from this record, and this is why I think Dudenhofer's a terrible decision, but you're stuck with it, all we know from this record is that there's no affirmative evidence that they did something. And I think the case says it's your burden to establish that it's more plausible than not that they did nothing. So how do I get there? Your Honor, I think you can get there by putting yourself in the shoes of a fiduciary. That's the touchstone for breach of the duty of prudence. And here it's just inconceivable that a prudent fiduciary who knew that a plan option had become 32 percent concentrated in one stock would not have done something to protect participants from the risk of loss. That's not a high burden. That's a burden that we expect mom-and-pop plans to meet and that they regularly meet. In fact, if you've affirmed the decision below here, you're effectively encouraging smaller plans and plans like the Disney plan here to ignore plan options as long as they're publicly traded and their own disclosures are not affirmatively misleading or fraudulent. That can't be the standard. It must be the case that the duty of prudence has content other than looking at the stock price and the returns on that investment. All right, thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. Thank you.
judges: Rawlinson, Hurwitz, Melloy